## 17884

Winston AARON, Respondent, v. HAMPTON MOTORS, INC., Appellant

(124 S. E. (2d) 585)

*James D. Walters, Esq.,* of Columbia, *for Appellant,*

*Melton Kligman, Esq.,* of Columbia, *for Respondent,*

March 13, 1962.

LEGGE, Justice.

Action by vendee against vendor of a used automobile seeking recovery of actual and punitive damages for fraud and deceit based upon alleged misrepresentation as to its condition and mileage. The trial judge granted a nonsuit as to punitive damages and submitted the issues of liability and actual damages to the jury, which returned a verdict for two thousand three hundred fifty ($2,350.00) dollars. Defend-

ant alone appeals, charging error in the refusal of its motions for nonsuit, direction of verdict, and new trial.

On September 12, 1959, under a written agreement of that date executed by both parties, respondent purchased from appellant a 1958 Plymouth, appellant taking as the down payment respondent's 1951 Mercury at an agreed valuation of $300.00 (less a balance of $102.00 due on it to a finance company, which respondent agreed to pay to that company on October 1, 1959), the balance, $2,302.20, to be paid by respondent in thirty consecutive monthly instalments of $76.74 each, commencing November 1, 1959.

The agreement contained, in large print, the following:

"It is further understood and agreed that the seller does not guarantee used or second-hand automobiles, and makes no representation or guarantee as to correctness of speedometer mileage shown on car, and does not obligate itself to do any free work or service on such cars unless specified in writing here below."

It also contained, under the printed caption "Special Agreement", the following, written in pencil as were all other provisions of the agreement not printed:

"Subject to credit approval 9-14-59 50/50 warranty 30 days or 1000 miles mileage 16,246."

Respondent testified that he had bought the 1951 Mercury from appellant, through its salesman Mr. Eleazer; that it had given good service; and that when he and his wife decided in September, 1959, to get a better car they went to appellant's used car lot and sought out Mr. Eleazer, who showed them first a 1957 Plymouth, then a 1958 Ford, and finally the 1958 Plymouth that he bought. He testified that Mr. Eleazer told him that in his opinion the 1958 Plymouth would be a better buy than the 1957 one if they could make a deal on the Mercury as a down payment, because although the 1958 Plymouth would cost about $200.00 more it had a heater and radio that the 1957 car did not have, and that it "was awfully clean and had only about 16,000 miles

on it." He testified that after a trial drive in the 1958 Plymouth he and his wife came back to the lot, where they examined the tires and the interior of the car, lifted the hood and looked at the engine, finding everything, including the engine, very clean; and that Mr. Eleazer said, in response to his inquiry, that his company had not "gone into the engine."

Respondent having agreed to buy the 1958 Plymouth and having agreed with Mr. Eleazer as to the value of the 1951 Mercury to be traded in, Mr. Eleazer prepared the written contract before mentioned, and it was then executed by him on behalf of the appellant, and by the respondent. The latter testified that he made the purchase in reliance upon Mr. Eleazer's unqualified representation that the car's actual mileage was approximately 16,000. Mr. Eleazer, on the other hand, testified for the appellant that in his transaction with respondent no mention was made of mileage, and that the words "mileage 16,246" had been written into the contract simply to afford a basis for the calculation of the 1,000-mile warranty under the "Special Agreement" before mentioned.

There is no controversy as to the meaning of the express "50/50 warranty 30 days or 1,000 miles" in the "Special Agreement".

Respondent testified that the 1958 Plymouth gave him no trouble until the early part of January, 1960, by which time he had driven it about 3,000 miles. Then it "started knocking", "threw" a connecting rod, and broke down. Understanding that the warranty period had expired, he asked appellant's service manager if the company would make the necessary repairs and, meanwhile, lend him a car; but he was informed that this could not be done. Being a long-haul truck driver and living some two miles from the place where he had to report for duty whenever called, and being thus in need of a car during the time that the Plymouth would be laid up for repairs, he then went to Snelgrove's Garage, in

West Columbia, where he was advised that they would repair his car and let him have another, without charge, while the job was being done. Accordingly, he left his car with them, taking theirs for use during the course of the repair job.

Snelgrove's shortly thereafter informed respondent that the engine was worn out and required new connecting rods and a new crankshaft. Respondent then, through the records of the State Highway Department, located its former owner, a Mr. Lee, of Columbia, whose business was that of a traveling salesman. Mr. Lee informed respondent and testified at the trial: that he had bought this car from Oliver Motors; that it had given him trouble and had "thrown a rod"; and that he had had it repaired by Oliver Motors, whose repair man told him that they would not guarantee the job; and that he, in August, 1959, had "traded it" two weeks later to Hampton Motors, appellant here. Mr. Lee testified that when he traded this car to Hampton Motors the speedometer showed mileage in excess of 55,000.

Mr. Shealy, service manager of Oliver Motors, testified that the 1958 Plymouth, then owned by Mr. Lee, had been repaired by his department on August 11, 1959, at which time the speedometer showed mileage of 54,957, and again on August 18, 1959, the mileage shown on the speedometer being then 55,320. He testified that the repair work sheets showed these repairs to have consisted of installing a drive shaft, replacing all connecting rods, and replacing main bearing; that this work required removal of the cylinder head and replacement of old gaskets with new ones; and that after completion of such a job it would be apparent to a mechanic or an experienced automobile dealer that work had been done inside of the motor.

Snelgrove's bill for repairing respondent's car was about $263.00. Respondent was unable to pay it, and was in default in payments under his purchase agreement. The finance company that held his obligation to appellant accordingly

repossessed the car and paid Snelgrove $200.00 in compromise settlement of the repair bill.

Respondent testified that in October, 1959, he paid to the finance company the balance of $102.00 owing on the 1951 Mercury. He testified that on the purchase price of the 1958 Plymouth he made two monthly payments of $76.74 each, plus "two or three" late charges of $4.00, and a further payment, in January, 1960, of $120.00. The correctness of the amounts so testified to is in dispute, appellant contending that only one monthly payment of $76.74 was made.

Exceptions 1 and 5 charging error in the refusal of appellant's motions for nonsuit and direction of verdict, are based upon the contention that negotiations leading to the sale of the car merged in the written agreement of sale; that the written warranty, limited to "30 days or 1,000 miles", was therefore conclusive; and that since the uncontradicted evidence showed that no defect appeared or damage occurred within the period of that warranty, respondent was not entitled to recover. We find no merit in this contention; the action was for fraud and deceit, and parol evidence on that issue was admissible despite the limited warranty. *Parham-Thomas-McSwain v. Atlantic Life Ins. Co.*, 111 S. C. 37, 96 S. E. 697; *Continental Jewelry Co. v. Kerhulas*, 136 S. C. 496, 134 S. E. 505; *Southern Iron & Equipment Co. v. Bamberg E. & W. R. Co.*, 151 S. C. 506, 149 S. E. 271; *General Motors Acceptance Corp. v. Whitehead*, 163 S. C. 236, 161 S. E. 494.

Exceptions 2 and 4, charging error in the refusal of the motions for nonsuit and direction of verdict, are based upon the contention that proof of two of the essential elements of fraud was lacking, in that there was no showing either (1) that appellant had knowledge of the falsity of its representations as to the mileage and condition of the car, or (2) that damage resulted from such misrepresentations. Exception 6 also charges that the proof of fraud was insufficient in that all of the evidence showed

that the respondent could have easily obtained, as he later did, information as to the actual condition of the car, and as to its true mileage, at the time of his purchase.

These exceptions are likewise without merit, in our opinion. Although there was no direct proof that the speedometer had been tampered with or replaced by another during the two weeks or so that appellant had the car, between the time of its acquisition from Lee and its sale to the respondent, we cannot say that such an inference would have been wholly without evidentiary support. And, aside from that, it is not necessary, in order to establish fraud, to prove that the person making the allegedly false representation had actual knowledge of its falsity; if he makes it as of his personal knowledge, with reckless disregard of his lack of information as to its truth, his knowledge of its falsity is legally inferable. *Gary v. Jordan*, 236 S. C. 144, 113 S. E. (2d) 730. We think, too, that there was sufficient evidence of damage to take that issue to the jury.

In our opinion the record here does not require the conclusion, as a matter of law, that respondent's claim was barred by the well-known rule, *Jones v. Cooper*, 234 S. C. 477, 109 S. E. (2d) 5, that one will not be heard to say that he was deceived by a vendor's misrepresentations if, by his own negligent failure to avail himself of information easily within his reach, he has contributed to the perpetration of the alleged fraud. It suggests no reason for respondent to have doubted, at the time of the sale, the statement of appellant's agent as to the condition and mileage of the car, nor does it indicate that he had any reason to know until Snelgrove's examination of the interior of the motor after its breakdown, that the engine and crankshaft and connecting rods were worn out, and that the car, in the comparatively brief period of its ownership by Lee, had actually been driven more than three times the number of miles shown on its speedometer and represented, according to respondent's testimony, by appellant's agent. Cf. *Gary v. Jordan, supra*.

Exception No. 3 reads as follows:

"That the Lower Court erred in speaking to the jury in a prejudiced, biased and antagonistic manner while commenting on the testimony of defendant's witnesses, thereby detrimentally influencing defendant's case, as set forth in the following portion of the record:

" 'The Court: Gentlemen, I've heard—to tell you the truth, I'm not going to hear, any more questions on that. I've heard it seven times. Any man—he made a payment of $102.00. He made two payments of $76.74 and he went back another time and made a payment of $43.26. Now why go over that over and over and over. I don't want to hear any more about that. Let's get on to something else. He traded in an automobile of a valuation of $300.00 over which there was a balance of a mortgage of $102.00. Now, let's get on to something else and leave that.

"The Court: Mr. Walters, you're going right back over the very same thing that I ruled against. I simply don't want to hear any more about these payments. It looks to me like a man in the first grade of school could have listened here and listened to that. That's just taking up the time of the court for nothing.

" 'Mr. Walters: Our purpose is—

" 'The Court: Mr. Walters, I don't care what your purpose is. I don't want to hear any more about those payments.

" 'Mr. Walters: Come down, Mr. Johnson.

" 'The Court: Now, so there can be no misunderstanding, I'll state for the benefit of the jury, and this is the last of it. According to these records here after that man bought that automobile he paid Commercial Credit, whatever the name is, the finance company, $102.00. He paid them $76.74. He paid them $76.74 again, and then he went back again and he paid them the difference between $76.74 and $123.48. Now, anybody in the first grade of school can add that up, or they ought to be able to add it up. I don't want to hear any more about it. Proceed. Next witness.' "

The colloquy above quoted appears only in the Exception itself. It does not appear, and indeed is not referred to, in the transcript of the trial proceedings as agreed upon for the purposes of this appeal. It is therefore not entitled to our consideration. In reaching this conclusion we are not to be understood as questioning the statement, implicit in the Exception, that such colloquy took place. We say only this, that, as we construe Rule 4 of this court, where an exception charges error in the conduct of the trial, the conduct to which exception is taken must appear in the transcript of the proceedings, and not merely be referred to in the exception itself. Notwithstanding, we shall consider it, lest our failure to do so be construed to imply that we think the remarks of the trial judge improper or prejudicial.

It is understandable that in his examination of a witness counsel's urge to drive home a point may lead him, quite unconsciously, to undue repetition of a question to which he has already received a favorable reply. It is no less understandable that the presiding judge, properly concerned that the trial should progress to its conclusion without unnecessary delay, may show impatience where counsel has been repetitious beyond the limit of his patience. But we cannot assume that the members of the jury will lightly infer prejudice, antagonism or ill-will toward counsel on the part of the trial judge. No such inference could reasonably have been drawn from the language quoted above. The exception is overruled.

Exception No. 7 reads as follows:

"That the lower court erred in not ordering a new trial *nisi.* in that the amount of the verdict of the Jury was not in accord with accepted judicial standards for measuring damages in this case; that the only damages shown was the investment by the plaintiff of approximately $500.00 less reasonable value of the use of the automobile for a 5 months period: That the lower court erred in not granting an order

of new trial in that the amount of the verdict was so excessive as to indicate prejudice, partiality, bias and caprice on the part of the Jury."

This exception attempts to present two distinct assignments of error, one relating to the trial judge's refusal to order a new trial *nisi*, the other relating to his refusal to order a new trial absolute. It therefore does not comply with the requirements of Rule 4, Section 6, and might well be rejected for that reason. But we have occasionally waived the breach of this rule where the faulty exception has attempted to present a meritorious assignment of error. *Jackson v. Carter*, 128 S. C. 79, 121 S. E. 559; *Brady v. Brady*, 222 S. C. 242, 72 S. E. (2d) 193; *Wallace v. Timmons*, 232 S. C. 311, 101 S. E. (2d) 844. We shall examine the exception here to determine whether reversal of the judgment below may be soundly based on either of the two purported assignments of error before mentioned.

The first is without merit. We have repeatedly held that the trial judge's refusal to reduce an excessive verdict by ordering a new trial *nisi* is not subject to our review. *Nelson v. Charleston & W. C. Ry. Co.*, 226 S. C. 516, 86 S. E. (2d) 56; *Brown v. Hill*, 228 S. C. 34, 88 S. E. (2d) 838; *Elliott v. Black River Elec. Co.-Op.*, 233 S. C. 233, 104 S. E. (2d) 357, 74 A. L. R. (2d) 907.

Consideration of the second entails some discussion of the approach on the part of both counsel and the court to the question of damages. As before noted, the trial judge granted a nonsuit as to punitive damages. The jury, having resolved the issue of fraud in favor of the plaintiff, was thus limited to a finding of actual damages. The charge as to such damages was as follows:

"Now, Mr. Foreman and Gentlemen of the Jury, I charge you this, if where sales are concerned, that is the buying and selling, the law in South Carolina is as follows: I'm not telling you this for you to apply this to fraud—I'm telling you this with reference to a warranty—I'll start off this way: In

the absence of agreement no one says anything, you go into a store and buy a shirt or a tie or a suit or an automobile or anything else, if there is no agreement made the law says that if you pay out your money, a sound price, you are supposed to get a sound article. Now there isn't anything in the law that makes it unlawful for people who buy and sell to stipulate the sale is made under certain conditions, and when people stipulate the sale under certain conditions, that ends it, and that constitutes what may or may not be. Now, bear in mind that I told you in the first part of my charge with reference to contracts that if fraud was present, that would vitiate, tear apart anything * * *. Now, with reference to damages, if in this case you did come to the conclusion that Mr. Aaron has proven his case and that fraud was practiced upon him and that he was damaged, in order to arrive at what would be a fair and proper amount to award him as actual damages, the general rule would be that he would be entitled to recover any damages that ordinarily and reasonably flowed and resulted to him as a direct and proximate cause of fraud having been practiced upon him. Now, without limiting it to the factors that I want to call to your attention I'll simply say here, money out of pocket, inconvenience and it's a common sense proposition. As I say, any damages ordinarily and reasonably flowed as a result of the fraud having been practiced on him."

The record before us does not indicate that any objection was made to his charge, or that any amplification of it was requested, or that any specific request was made on behalf of either party for a charge on the measure of damages. The charge above quoted is not challenged by any exception. The exception under consideration suggests that appellant considered the measure of the plaintiff's damages the sum of the instalment payments actually made by him, plus the trade-in allowance on his 1951 Mercury, less the "reasonable· value of the use" of the 1958 Plymouth during the period of his use of it.

Punitive damages having been eliminated, the measure of respondent's actual damage was the difference between the represented value and the actual value of the 1958 Plymouth at the time of his purchase of it. *Turner v. Carey,* 227 S. C. 298, 87 S. E. (2d) 871; *Warr v. Carolina Power & Light Co.,* 237 S. C. 121, 115 S. E. (2d) 799. Inconvenience is no more proper as an element of damage in such case than it would be in an action for breach of warranty. *Cf. Cannon v. Pulliam Motor Co.,* 230 S. C. 131, 94 S. E. (2d) 397.

Had the jury been instructed as to the measure of damages, such evidence as they might have been able to consider with regard to the actual value of the 1958 Plymouth at the time of its sale to respondent was quite vague and indefinite; it seems fair to say that none of the evidence was expressly or specifically directed to that issue. Having some bearing on it was Lee's testimony that the car had been driven over 55,000 miles during the first year or so of its life and that the motor had given trouble then. So also was that of Snelgrove's mechanic, Mr. Amick, who in addition to specifying the mechanical faults apparent within the motor system some four months after respondent's purchase, stated that the car was "just wore out". So also might the jury have considered whether, despite the high mileage, Snelgrove's repairs to the amount of $263.00 might or might not have brought the car to a state of value comparable to that which it should have been in, after respondent's use of it for four months, had its mileage and condition at the time of its sale to respondent been as then represented by appellant.

The verdict in the case at bar may or may not be subject to the charge of over liberality; but that is a matter with which we have no concern. The power of this court to strike down a verdict *in toto* is exercised only in those rare instances in which its amount is so shockingly excessive as manifestly to show that the jury was actuated by passion, partiality, prejudice or corruption. *Mock*

*v. Atlantic Coast Line R. Co.,* 227 S. C. 245, 87 S. E. (2d) 830. The record in this case does not enable us to reach that conclusion.

Affirmed.

TAYLOR, C. J., and Moss and LEWIS, JJ., concur.