### 2083

Roger NINE, Appellant v. Rodger A. HENDERSON and Terminix Service Incorporated, Defendants, of whom Rodger A. Henderson is Respondent.

(437 S.E. (2d) 182)

Court of Appeals

*Barry H. Johnson,* Aiken, *for appellant.*

*Richard L. Pearce,* Aiken, *for respondent.*

Heard Sept. 7, 1993.

Decided Oct. 25, 1993. Reh Den. Dec. 6, 1993.

GOOLSBY, Judge:

This is an action for breach of warranty and for fraud arising out of the sale of a house found to have termites. Roger Nine, the buyer, appeals the trial court's grant of summary judgment to Rodger A. Henderson, the seller. The dispositive question on appeal, which relates only to his fraud claim,[1] concerns whether Nine had a right to rely on Henderson's representation regarding the extent of termite infestation on the property. We affirm.

Henderson and Nine, a Wackenhut security inspector, executed a contract of sale on August 3, 1987. Nine's own attor-

---

[1] The trial judge granted Henderson summary judgment on Nine's breach of warranty cause of action, holding "Henderson did not warrant to [Nine] the condition of the [subject] premises, neither expressly nor impliedly." Nine does not appeal this holding.

ney had prepared the contract. The contract required Nine to purchase property owned by Henderson. The property included a house, a cottage, and a garage.

One provision of the contract noted Nine "is buying [the] subject property in 'as is' condition, and [Henderson] make[s] no warranty or representation as to the condition of the premises." Another provision incorporated "an existing termite report known to and acknowledged by the parties" and required Henderson to pay Nine $200 for labor and materials expended by Nine in repairing termite damage to the house.

The parties closed four days later, on August 7, 1987.

During the negotiations that led to the execution of the contract of sale, Henderson disclosed to Nine that a termite inspection done the previous May revealed the presence of termites in the eaves of the house and in the window sills and doors of the garage. Henderson, however, did not tell Nine about the three graphs made by the termite inspector. These graphs show additional termite infestation and damage.

For a two-week period prior to closing, Nine rented and occupied the house. He personally repaired the termite-damaged eaves on the side of the house and repaired some additional damage that he discovered along the front of the house.

At the closing, which Nine attended accompanied by his attorney, Henderson furnished Nine with three wood-infestation reports. These reports were made the day after the parties signed the contract of sale by the same termite inspector who made the May inspection. They separately detailed inspections that the termite inspector made of the three improvements located on the subject property. They also set forth the inspector's conclusions regarding the presence of termites and other wood-destroying insects in each of the buildings.

The report relating to the house expressly noted there had been a previous infestation of termites and there was evidence of prior termite treatment. Visible evidence of the prior infestation, the report warned, could be found "to the eaves above the front porch slab." The report cautioned "[t]here is possible hidden old termite damage to the inside walls." A graph attached to the report concerning the house advised of "subterranean termites," "probable hidden damage," and "possible hidden termite damage in walls."

The report relating to the cottage also cautioned "[t]here is

possible hidden termite damage behind the kitchen cabinets from previous infestation and along [the] baseboard by window." A graph attached to this report advised of "subterranean termites," "probable hidden damage," and "probable hidden old termite damage behind [the] kitchen cabinets and baseboard."

All three reports counseled Nine:

> If there is evidence of active or past infestation of termites . . ., it must be assumed that there is some damage to the building caused by this infestation.

> \*     \*     \*     \*     \*     \*

> Any visible damage to a wood member in accessible areas has been reported. . . . [Y]ou may wish to call a qualified . . . expert in the building trade to ascertain their [sic] opinion as to whether there is structural damage to this property.

Despite receiving these reports and having an opportunity to read them, Nine nevertheless elected to close. He later discovered termites, as we read his testimony, behind the walls in the kitchen of the house.

This action followed.

In granting Henderson summary judgment on Nine's cause of action for fraud, the trial court pointed to the language in the wood infestation reports furnished Nine at the closing, particularly the language advising Nine of prior termite infestation and recommending Nine retain a qualified expert to determine whether the buildings had structural damage.

We agree with Nine that the question of whether reliance is justified in a given situation requires an evaluation of the circumstances involved, including the positions and relations of the parties. *Elders v. Parker*, 286 S.C. 228, 332 S.E. (2d) 563 (Ct. App. 1985). We also agree, however, with the trial court that Nine, under the circumstances here, had no reasonable right to rely on Henderson's representations regarding the extent of termite damage to the building in question. *See Bostick v. Orkin Exterminating Co., Inc.*, 806 F. (2d) 504, 508-09 (4th Cir. 1986) (construing South Carolina law and holding a purchaser of a home infested by powder

post beetles had no right to rely on favorable answers on a wood-infestation report given the purchaser at the closing where the purchaser elected to close and failed to comply with a recommendation in the report and a South Carolina regulation that he investigate for structural damage).

Nine knew from the very start the property had termite problems. He himself discovered additional damage. By choosing not to postpone the closing and electing instead to proceed with it, he ignored, if not outright rejected, advice to have a qualified person ascertain whether the improvements on the property had sustained structural damage because of termites. Such an inspection could have revealed the additional termite damage. In short, Nine's own actions placed him in the predicament in which he now finds himself. *Cf. Watts v. Monarch Builders, Inc.*, 272 S.C. 517, 519, 252 S.E. (2d) 889, 891 (1979) (wherein the supreme court affirmed the grant of summary judgment in a fraud case involving the sale of real property, noting that it was not a case of fraudulent misrepresentation but was "a case where two purchasers chose to shut their eyes"); *Aaron v. Hampton Motors, Inc.*, 240 S.C. 26, 124 S.E. (2d) 585 (1962) (one cannot claim he was deceived by a seller's misrepresentation if he has failed to avail himself of information easily within his reach because he has, in fact, contributed to the perpetration of the fraud).

Affirmed.

HOWELL, C.J., concurs.

CURETON, J., dissents in a separate opinion.

CURETON, Judge (dissenting):

Because I disagree with the majority's conclusion that the buyer, Roger Nine, had no right to rely on representations made by the seller, Rodger A. Henderson, of the condition of the property, I am constrained to dissent.

The properties involved in this action consist of three structures—a main house, a rental cottage, and a garage. In May 1987, prior to putting the properties up for sale, Henderson had them inspected by Terminix. The inspection reports are not in the record; however, the inspection graphs given to Henderson indicate considerable termite damage or suspected

termite damage to the properties.[1] Nine and Henderson talked five or six times before signing the Contract of Sale for the properties during which time none of the inspection reports or inspection graphs were shown to Nine. Nine testified that Henderson informed him that there was only minor termite damage to the eaves of the house, and to the window sills and door of the garage. Nine occupied the house pursuant to a rental agreement for approximately two weeks before closing and repaired this damage,[2] as well as some other damage not associated with termites.

At an August 7, 1987 closing, Henderson provided Nine with wood-infestation reports which stated, as to the main house (1) "[t]here was visible evidence of old previous termite infestation to the eaves above the front porch slab area" which were in the process of being repaired "at the time of the inspection" and, (2) "[t]here is possible hidden old termite damage to the inside walls but no visible structural damage was apparent at the time of inspection." The reports also contained other boilerplate language designed to exculpate Terminix for damage to in accessible areas.[3]

Nine's primary contention is that Henderson did not provide additional information detailing the full extent of the damage to the properties.[4] In particular, Henderson did not provide him with the information acquired from the May 1987 termite inspection. Nine testified, "there was no way in this world I would have bought that property had I seen that letter." Moreover, Nine argues the inspection graphs he re-

---

[1] The graphs are difficult to read and no one fully explained what the numerous notations on them mean. The box "Repairs Recommended = "X" " is checked and there are numerous Xs shown on the main house graphs. Further development of the facts should reveal what Terminix told Henderson needed to be done to the house.

[2] Because Nine had to remove his furniture from his residence on or before August 1, 1987 and because he did not know whether or not he could obtain financing to purchase the subject properties, the parties entered into a short-term rental arrangement. They further agreed that Nine would repair the items noted above and be paid $200.00 by Henderson. During the repairs, Nine became aware of some additional damage to the eaves of the house which had not been shown to him by Henderson. Whereupon, Henderson furnished the materials for Nine to repair the additional damage.

[3] The other reports also contained language indicating there was visible evidence of prior termite treatment and possible hidden termite damage, but no visual structural damage at time of inspection.

[4] Nine testified that the cost to repair all termite damage is $43,000.

ceived at closing did not reveal all of the termite damage and repair work that Terminix had recommended be done in the "May graphs."

On the other hand, Henderson testified in his deposition that the parties discussed termite damage on two occasions prior to closing, and that he informed Nine of all termite damage of which he was aware. He admitted in his deposition that he did not show Nine the May termite information form Terminix and agrees with Nine that prior to closing he only informed Nine of the repairs noted by Nine. Henderson explained that these repairs had been requested by Terminix to ensure "a clean bill of health." In admitting that he did not reveal the "May graphs," he elaborated:

> I didn't see any reason to [show Nine the May inspection graphs prior to closing]. It's like if I sell a used car, do I need to show the man how much I originally paid for the car, or the contracts? I don't know what you're asking for here.

The Contract of Sale was signed on August 3, 1987 and provides that the "[p]urchaser is buying subject property in 'as is' condition and seller makes no warranty or representation as to the condition of the premises." The Contract of Sale did not make the passing of title contingent upon an acceptable termite inspection report. While Henderson argues that it is implied that the sale was so conditioned because a lender was involved, it is inferable the August report satisfied the lender. Thus, it is not clear to me that Nine had a right to reject the deed on the date of closing because of the termite damage he later found.[5] The Contract of Sale also incorporated by reference an "existing termite report,"[6] and provided for payment of $200 to Nine as the cost of repairing termite damage identified in the report.

On appeal, Nine concedes that while he was aware of some termite damage, he was led to believe that it was minor and that he had corrected the damage found by Terminix. He argues he had a right to rely on Henderson's representations re-

---

[5] Further development of the facts may serve to resolve this point.

[6] Henderson testified that the Contract of Sale refers to the August 4, 1987 reports, not the May termite reports as suggested by the majority.

garding the extent of damage, and further argues that the trial court erred in granting summary judgment because the question of whether his reliance was "justifiable" is a factual question for the jury.

Henderson responds that Nine had no right to rely upon the alleged misrepresentations because: (1) the August report gave Nine notice of previous termite infestations of the property and of the need to consult an expert; (2) the "as is" provision of the Contract of Sale gave Nine notice that Henderson had made no representations as to the condition of the property; and (3) by assuming responsibility to repair all damage to the property, Nine assumed responsibility for determining the extent of damage.

The trial court granted Henderson's motion for summary judgment on the ground that Nine was not justified in relying upon any alleged misrepresentations regarding the extent of termite damage because he was on notice prior to closing of previous termite infestations, but failed to make further investigation.[7]

It is well established that summary judgment is proper only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Baugus v. Wessinger*, 303 S.C. 412, 401 S.E. (2d) 169 (1991). In determining whether summary judgment is appropriate, the court must construe all ambiguities, conclusions and inferences arising from the evidence most strongly against the moving party. *Byers v. Westinghouse Elec. Corp.* — S.C. —, 425 S.E. (2d) 23 (1992). In the record before us, I find genuine issues to be determined by the trier of facts. As a minimum, further inquiry into the facts is desirable to determine application of the law. *Powell v. Bontiz Insulation Co.*, 273 S.C. 98, 254 S.E. (2d) 311 (1979).

Relying principally on *Bostick v. Orkin Exterminating Co., Inc.*, 806 F. (2d) 504, 509 (4th Cir. 1986), the majority affirms

---

[7] The court observed that the wood infestation report provided to Nine at closing warned of previous termite infestations and treatments, the existence of prior damage, and the possibility of hidden damage, and stated that certain areas were inaccessible to inspection. The report also provided that the buyer should presume damage because there was evidence of a prior infestation, and that the buyer should consult an engineer or person expert in the building trade to determine the actual extent of damage.

the grant of summary judgment concluding that Nine had no right to rely on Henderson's representations as a matter of law. However, reliance on *Bostick* in this case, I believe, is misplaced. Contrary to the case at issue, that suit was brought against an exterminator by the subsequent purchaser of a home because of structural damage to the home. The plaintiff's theory was based solely on representations contained in Orkin's Wood Infestation Report which by state regulation could not serve as a structural damage report. The seller was not a party to that case and made no representations regarding termite infestation. The court held that the plaintiff could not rely on representations in the report that were favorable to him and ignore warnings and recommendations not favorable to him. Here, however, Nine seeks to rely on representations made by Henderson. Whether or not exculpatory statements made by a third party should defeat Nine's right to rely presents a different issue than was involved in *Bostick.*

In South Carolina, the buyer of a house has a right to rely on the seller to disclose latent or hidden defects which are not discoverable by reasonable examination and of which the seller has knowledge. *May v. Hopkinson*, 289 S.C. 549, 557, 347 S.E. (2d) 508, 513 (Ct. App. 1986) (citing *Cohen v. Blessing*, 259 S.C. 400, 403, 192 S.E. (2d) 204, 205-06 (1972)). South Carolina law provides that insect infestation may be a latent defect in property, giving rise to a duty to disclose on the part of the seller. *Cohen*, 259 S.C at 403, 192 S.E. (2d) at 205. Furthermore, the recipient of a fraudulent misrepresentation of fact is justified in relying on its truth although he might have discovered its falsity through investigation. *Reid v. Harbison Dev. Corp.*, 285 S.C. 557, 330 S.E. (2d) 532 (Ct. App. 1985). However, the party who alleges fraud and a right to rely must exercise reasonable diligence under the circumstances. *Bostick, supra* (citing *Florentine Corp. v. PEDA I, Inc.*, 287 S.C. 382, 386, 339 S.E. (2d) 112, 114 (1985)).

As noted above, it is clear to me that Henderson made a positive representation to Nine that if certain minor repairs were accomplished, the house would receive a "clean bill of health" from Terminix. It is also inferable that Henderson knew of extensive termite damage as a result of having been furnished the May reports and/or graphs and concealed the

damage from Nine.[8] The evidence also reflects the closing was "rushed" and the August reports were delivered during the closing. I am not convinced the law would require Nine to discover the significance of the language in the reports concerning possible hidden termite damage, delay the closing and go out and hire an engineer to inspect the properties. In fact, the facts do not show he had a right to tear our walls or dig up concrete slabs to discover any hidden damage. It stands to reason that because Terminix, who is an expert in the detection of termite damage, did not discover the damage, we should not hold, Nine, a layman, to a higher standard.

Henderson next maintains in his brief that the "as is" provision in the contract bars Nine from any recovery. However, an "as is" provision does not have this effect in an action for fraud and deceit in the sale of real estate where the seller is held to a stricter accountability. *MacFarlane v. Manly*, 274 S.C. 392, 264 S.E. (2d) 838 (1980). In *MacFarlane*, the court stated:

> The "as is" clause of the contract does not constitute an absolute defense to an action for fraud and deceit. The inclusion of "as is" clauses is usually an effort on the part of the seller to assure application of the *caveat emptor* rule. In *Lawson v. Citizens and Southern Nat. Bank of S.C.*, 259 S.C. 477, 193 S.E. (2d) 124 (1974), we said: ". . . the doctrine of *caveat emptor* does not apply in cases of fraud."

Henderson also argues in his brief that by assuming responsibility to repair all damage to the property, Nine took it upon himself to determine the extent of damage. Viewing the evidence in the light most favorable to Nine, I think a reasonable inference can be drawn therefrom that Henderson represented to Nine that several minor items remained to be repaired for which the parties agreed that $200.00 would be adequate to repair these remaining items. The record does not reflect that Nine agreed to assume responsibility for discover-

---

[8] In May 1987, Henderson signed an "OFFICIAL WAIVER OF STANDARDS FOR THE CONTROL OF SUBTERRANEAN TERMITES IN STRUCTURES" waiving and declining certain "standard treatment procedures" ". . . due to economic reasons and customer [Henderson] to do himself." Check marks on the Waiver reflect that the treatment procedures declined were: "Wood in direct contact with soil placed on concrete base, treated or removed" and "foundation walls, piers, pillars, supports, and pipes rodded or trenched and treated."

ing and repairing all damage to the properties regardless of the extent of damage. In fact, Nine entered the property under a lease agreement. A tenant has no obligation to discover hidden defects in the leased premises.

Therefore, I cannot conclude as a matter of law that Nine failed to exercise reasonable diligence under the circumstances of this case in relying upon representations regarding the extent of termite damage, despite his knowledge of previous termite infestations and the cautionary language of the August report. "Issues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of facts." *Unlimited Servs., Inc. v. Macklen Enterprises, Inc.*, 303 S.C. 384, 387, 401 S.E. (2d) 153, 155 (1991) (quoting *Starkey v. Bell*, 281 S.C. 308, 313, 315 S.E. (2d) 153, 156 (Ct. App. 1984)). "Summary judgment should not be granted ... if there is dispute as to the conclusion to be drawn from [the] facts." *Baugus*, 303 S.C. at 415, 401 S.E. (2d) at 171; *See also, MacFarlane v. Manly, supra.* Moreover, further development of the facts, in my opinion, is desirable to clarify the application of the law. *Gardner v. Campbell*, 257 S.C. 209, 184 S.E. (2d) 700 (1971).

Accordingly, I would reverse the trial court's grant of summary judgment.